And you may begin. Good morning. May it please the Court. My name is Robert Greer. I represent the appellant Brad Young. If David Gantz had chosen to drive his motorbike down the fence line where the pedestrians usually walked and clobbered my client at that point, setting aside for a moment whether the bike was made for mainly off-road purposes, I would agree with the trial judge that there is no coverage. However, there is contradictory evidence that requires this matter to be tried by the trier of fact. To be sure, Mr. Young did testify in deposition that his recollection was that he was near the fence line where pedestrians usually walked at the time he was hit. However, the contradictory evidence exists and was ignored by the trial judge. And what is the contradictory evidence? The contradictory evidence are four individuals who came on the scene immediately after it happened, who knew Mr. Young, who located him on... They came on the scene afterwards. How do they know where Mr. Young was? Sure. They were close enough, Your Honor, to hear the hubbub outside when people started to gather and they walked out of their house onto the sand road. How does that tell us anything about where Mr. Young was when he got hit by a Gantz? Well, it takes a little bit of inference, Your Honor, and let me kind of walk through it. Both Mr. Young and his wife were on the sand highway. The witnesses estimate the distance from where they were laying approximately 20 yards, 20 to 30 yards from the fence that was identified as where pedestrians walked. And this is where, after these folks heard the hubbub, came out and saw where Mr. Young and his wife were lying? Yes, and he was unconscious. He had had... But they didn't know whether somebody had dragged them there, whether somebody had been knocked there, whether they had stumbled there after they got hit? Well, the inference was if he was laying still and apparently unconscious, that nobody is dumb enough to move his body from another location. That's a big inference, and the problem is that Mr. Young said he was walking along the fence. I understand that, but what I'm saying is it still raises a question of fact. You cannot automatically dismiss what the eyewitnesses said of where he was after the fact. Except they're not eyewitnesses to the accident. That's the whole problem. Well, by analogy, Your Honor, if there is a witness who said, I saw the alleged assailant drop a bloody knife and walk away from a bleeding body, that is evidence that suggests that maybe he had something to do with the wounds. I'm saying that that is circumstantial evidence sufficient to raise a question of fact. But as to Judge Bivey's point, if the victim then said, hey, it wasn't him, I mean, I think that's what Judge Bivey's question is, right? The victim says, oh, no, it wasn't that guy. He wasn't the one who stabbed me. It was the one over there. Sure, I understand that. So I appreciate the circumstantial evidence that the four give, but what do we do? This is a very unusual case because of the situation. You're asking us to disbelieve your client. And so can you point us to authority in the maiden and benign, because this usually doesn't happen, but where we are to disbelieve the victim in an insurance case and believe the other witnesses to survive summary judgment?  You might be right. I'm just, you know. Sure, and that's a fair question. And there is no direct authority. We have generic authority that simply says that when you look at the totality of the evidence, that you have to give all of the inferences in favor of the nonliving party, in this case us, and that if there is a logical connection between the circumstantial evidence and the fact that it is advanced to prove, then that has to be taken into consideration and let a prior effect do this. Pardon me, I've suddenly got dry mouth. No problem. So the idea would be, in opening statement, you would say something effective. Ladies and gentlemen, you're going to learn that my client at deposition said he thought he was hit here, but you're also going to hear a number of witnesses that elsewise, and when he said that, he may have had brain damage or something like that. Sure. You're going to hear that he had eight fractured vertebrae at the time. He was unconscious. He was life flatted out. He had punctured lungs. He had a lacerated kidney. He had a lacerated spleen. He had four broken ribs. And afterwards, he had some cognitive issues. And yes, that's what he testified to. However, you take that evidence and take his condition at the time and you kind of consider what his memory was and then consider what the aftermath was. A reasonable inference is that if someone is lying unconscious on the road, he probably did not walk there. A reasonable inference is that people... How far is the pedestrian area by the fence from the sand highway? It varies, but not much. David Karbinsky said he was 45 to 50 feet from the fence line. Lisa Deque said he was 10 to 20 yards from the fence line. Glenn Abbey said he was 10 to 15 yards from the fence. Jenny Karbinsky puts him five feet on the other side of the berm but doesn't testify how far the berm was. And we know that in order to block traffic on the sand highway, Michael Schaefer pulled his car perpendicular to the road so that he wouldn't be at risk of being hit again because he was on the highway. I mean, the photographs are a little bit confusing. There's an Exhibit 4 which has some markings in it. Does that depict the area near the fence where the pedestrians would be versus the sand highway? I couldn't quite tell. You know, I think the red line indicates where the fence line was and the blue lines to the right indicate the parameters on either side of the sand highway. But what I can't tell you, and I don't know if the record shows, what point along that road exactly was the impact. There is another photograph in the district court record which was called Exhibit 3, and it shows the road from a different perspective with a fairly large building to the left. Is that building to the left the Biffle compound that he was leaving? Do you know that? You know, I'm sorry. I do not know that. I think he was downrange on the picture where he started and was walking west toward where the camera angle is. Beyond that, I can't be more precise. And then this has some markings on a road in this Exhibit 3, and there's two people walking further into the photo. But it looks like, well, again, you haven't given us very good physical or diagrammatical evidence of what the relationship between these is. But I'm wondering, are where the two people walking in that photo, is that near the pedestrian area? Your Honor, can you direct me to the excerpts of record number? It's not in the excerpts of record. It's in the district court record, but you didn't put it in the excerpt. It's Exhibit 3. Well, that would explain my concern then. It's in the district court docket 68-7. So I just was wondering whether you were familiar with that photo because you're trying to make sense of the record. Sure. I don't think that was addressed in the deposition. It may have been part of the record, but I'm sorry. One of the issues that was raised, one of the questions you asked, had to do with, if the witnesses did not see the actual collision, if it wasn't contemporaneous with their observation, what does that do with respect to whether it raises a fact, a question of fact? The defense, Argus Insurance Company, objected to the evidence saying that it lacked foundation and it wasn't relevant because it was not contemporaneous or they did not actually see the impact. They saw only the aftermath. The judge, the trial judge, did not say one thing or one way or the other whether that was admissible or not. And it seems to me that that does not allow this court to assume that the reason that the judge ruled was he determined in advance that none of that was admissible, none of it relevant, that it wouldn't help a trier of fact decide anything. That is a procedural matter that I think this court cannot jump over in order to decide that the judge must have answered the question himself. I cited a Hollingsworth Terminal case that this court instructs trial judges that they need to resolve the evidentiary issues before the court, before ruling on the summary judgment. Counsel, if we take the Sand Highway as a public road, where were they found? Were they found towards the center line, if there was an imaginary line on that road? Were they found on one side on the edge? Or where precisely were they found? There is a berm on the north side of it. The witnesses who left their declarations and went to the scene, they referred to the berm between the fence line and the Sand Highway itself. So there is a demarcation. Okay. And the berm is raised with respect to the – if you were walking perpendicular to the – from the fence to the road, you're walking perpendicular to the road in a straight line, would you have to walk up? You're walking out of a swale, up a berm? Fence, swale, berm, highway. Okay. And where were they found, on the berm or in the middle of the road? One – the witnesses put him in the middle of the road. Jenny Karbinsky puts him – ER-161 puts him five feet from the berm toward the center of the road. All of them put them from 15 to 20 yards from the fence. And I placed it this morning. Do you have any expert witnesses that testified as to how far somebody could have been knocked by the motorcycle? No. There's no – so there's no evidence of that? We haven't gotten that far in the case yet. I'm sorry. Okay. So we don't have anything other than this conflict in testimony between the declarants and Mr. Young? That's true. Do you want to reserve your remaining time? I've got two minutes. I'd be happy to do that. All right. Let's do that. May it please the Court. My name is Kevin Barrett. I represent Owner's Insurance Company. I want to touch just briefly on what the Court's been talking about with respect to this purported conflict of evidence. And I think the Court has already sort of identified one of the problems with these declarations is that they don't contain personal knowledge. The Court gets to review everything de novo, and part of that's going to be looking at these declarations. And I would first submit that these aren't even declarations. If you read them, what they say is, is I have personal knowledge, or I believe the person who told me this stuff, and then it sets forth this information. I don't think that in and of itself even constitutes admissible evidence that would be – could support a finding in this case. These declarations are really just e-mails that were signed by these witnesses, that were prepared by counsel, that we have no idea whether or not these people have personal knowledge of anything. Because they say, eh, I trust the person who told me, which would be Mr. Young's counsel. The second is the point that the judge has already identified, is that they're not personal knowledge of what happened in the accident. They didn't see the accident. They weren't there. There's no indication of how quickly they came out after the accident occurred. One of the declarants said that the police were already questioning Mr. Gantz at the time that they arrived, which had to have taken some time after the accident. And they have no idea, again, whether anybody was moved. There's just no personal knowledge of anything. There's really only three people who could know what had happened in the accident. That would be Mr. Gantz, and I can't remember if it's in the record or not, but he was too drunk to remember. That was a DUI accident. There was Mr. Young, who told you exactly where he was in no uncertain terms. And then there was Mr. Young's wife, who's now his ex-wife, Wendy. She was there, and if her testimony would have supported what the other witnesses would have said, as the only other person with personal knowledge, I would submit that her declaration or testimony would have been obtained to support this argument. Is there anything from her in the record? No. And you would think that if she was going to say where they were, that there would be. Instead, what we have is Mr. Young, and as the district court identified and is clearly set forth in the record, he tells you where he was. This sort of after-the-fact idea that he had a concussion at the time, I mean, I'm certainly not saying that he wasn't injured by the accident because he was injured, but at the time he gave his deposition, he certainly didn't indicate that he had any memory problem, either at the time of the accident or at the time of giving his deposition where he explained exactly where he was. So to the extent that there's any question at all about where he was, Mr. Young has already answered that question. What do we make of the reservation in Giddings of the scenario where the car is on the road and goes off? Because it says, admittedly, if the off-road vehicle was traveling in an area intended for travel and through some mishap veered from this area and struck the utility pole, the fact that the utility pole was in the line of travel would not in itself preclude a finding that the accident occurred on a public road. So it distinguishes the situation where the vehicle is on the public road, veers off and hits something, which was not the situation in Giddings. In Giddings where, you know, this odd go-cart was going, you know, it was traveling, didn't veer into the side area, it was traveling in the side area. And isn't this case closer to what was reserved in Giddings? How do we know that he wasn't on the road and veered off and hit him in the pedestrian area and that would fall within the Giddings exception? That's an excellent question, Your Honor. And I think the answer to that is what the district court didn't do, which was actually answer the question of whether or not this sand highway is an actual public road. That's the question that you, on de novo review, need to answer. The district court didn't get there, but the record is plainly clear that this is not a public road. If we disagree with you, then should we reverse the district court? No, you can support the district court's finding on any matter that's supported by the record. But you just told us that we needed to decide that question. Do we need to decide that question or don't we need to decide that question? I apologize, Your Honor. If you're going to affirm or if you're going to affirm on the basis of the other matters where Mr. Young was standing, you can affirm and that's fine. If you have a question at all about where Mr. Young was standing, and I don't think you should, but if you do, the proper analysis under Giddings, which I think is indisputably the controlling case law here, is the common sense approach of what is a public road. So let me rephrase what I understood Judge Collins' question to be because it's a question that I would now like answered. So if we thought, or at least couldn't exclude the possibility, that Gants was driving down the sand highway, which may or may not be a public road, and he veered off of the road, over the berm, through the swale, and then hit the Youngs near the fence, does that come within Giddings if we thought this was a public road? I don't think so because then we're still talking about the overall arching situation, and that's kind of one of the things I think that gets lost here, is that we're talking about off-road vehicles, off the road, engaging in activities that are sort of beyond the scope of normal underinsured motorist coverage. There's discussions in the papers about what the Financial Responsibility Act is supposed to mean and what you're supposed to, what vehicles it applies to. But it has to be an off-road vehicle off the road. And if he was on the sand highway and we didn't, you know, didn't resolve the issue of it being a public road, so if he's on the sand highway and then veers off, I don't see how Giddings reserves that question and doesn't say that if the vehicle is on the public road and comes off, it doesn't say that that would be an off-road use. I agree, Your Honor, and that's why I think it's important for this panel to reach the question of whether it's a public road or not because that answers the question completely. The judge in the underlying case found that Mr. Young was not on a public road and applied Giddings to say if he's that far off the road, no reasonable person could think he was on the road and therefore, you know, using a common sense approach, there's going to be no underinsured motorist coverage available. He stopped short by saying, I don't need to decide that issue. What does the record say about where he was before he hit them? Does it say that he was on the road or was he coming down the pedestrian area along the fence? By he, you mean Mr. Gantz, Your Honor? Yes, exactly. He doesn't remember because it's a DUI, so he doesn't remember, and Mr. Young was hit from behind, if I believe, so he doesn't have any personal knowledge of the direction of where the vehicle was coming from. And no other witnesses? There are no other witnesses who could cast any light on that? There are none, Your Honor. That's why I was getting back to the point, the only other person who might know something is Wendy and her testimony is not in the record. But that, again, gets to the point of applying Giddings to the undisputed facts of this case. And Your Honor identified matters that weren't in the record. I think you may be incorrect on that. I think the excerpts of record at page 59 is the same picture that you're talking about, the one that has the blue and red lines. And if you're applying Giddings— That's Exhibit 4. This exhibit? Right. Yeah, there's another picture, Exhibit 3, which has it from a different angle, and there's a large compound. I was wondering whether that was the compound that he had left. I don't believe so. I believe that that is a permanent structure that's there for vendors. Okay. So there's—if you look at this overall, the Imperial Sand Dunes area, it's a very wide open space, but there are some private areas in there. There's some compounds that have some fences, and there's a couple main buildings, some restaurant facilities, and other things scattered about it. But what I would think the Court would implore this panel to do is to look at those two pictures that you've just identified. If you look at that exhibit, and I think it's Exhibit 3 that you just spent, look at it just with common sense. Is that a road to you? If you look at the undisputed testimony of Sergeant Nassad, he explains exactly that this isn't a road. This is a pathway that the regulars may use, but it's not graded. It's not marked at all. There may be some natural features that have been identified with a berm or some swale or something like that, but this is not a road. The impression that Mr. Young tried to create through his pleadings is that they're driving down I-10, and that's simply not the case. Unfortunately, I think there's a little bit of disconnect in some of the case law and the statutory law and the policies when they talk about public road and off-road and off-highway and on-highway and things like that. I think if you look at the controlling case of Giddings, it tells us what to do. It says use your common sense. Use your common sense. Look at the markings around here and what a reasonable person around here thinks they're on a road. Now, in Giddings, the question, as you identified, is how far off the road? What makes a road a road? Does it have that particular paving? I mean, this is regularly used by vehicles, autos, for getting in and out. The county enforces traffic laws on it. There's a speed limit that applies to it. Why isn't that a road? It's just it's because if they put asphalt on it, then it's a road, but because it doesn't have asphalt, it's not? With all due respect, Your Honor, your question is asking incorrect facts. As Sergeant Mishad said, there are no special rules on this road. Once you hit the sand, all the rules are the same. There's no special rules for the quote-unquote sand highway because it's not a highway. It's not a road. It is an area of the dunes that people use to get back and forth conveniently because it's the way that they set up every year. It's convenient to sort of get back and forth across some of the areas. What's the speed limit on the sand highway? There is none because there is no highway. So there's a comment in the record that the Bureau of Land Management has a 15-mile-an-hour speed limit for sand highways. Is that not applicable here? That is not correct, Your Honor. The record shows that there are rules about areas of congestion and about what speed you're supposed to be around other people, but the sergeant couldn't have been any more clear that he said that there are no special rules for the sand highway. It's not like they go out there and enforce, if you would like to think of it that way, the rules of the road when it comes to the sand highway as opposed to any other speck of dust out there. You're on the dunes. You're out away from not only just paved roads, but these are people that are just camping anywhere. And I think one of the things that the sergeant said I think is very telling is that when he was being questioned, he said, look, somebody could go out there and set up on the quote-unquote sand highway. People go out there every year, and they develop a practice of where they park and where it's convenient, where vendor row is and things like that. And there's been some pathways over the years that are commonly used by the regulars. Is this area within the Imperial Sand Dunes? Yes, Your Honor. Because I'm looking. It's SCR 66, which I think is your excerpt, and it's Imperial Sand Dunes Rules and Regulations. A 15-mile-an-hour speed rule exists on the sand highways. No person shall operate an OHV in excess of 15 miles per hour on public lands and then goes on. Right. There is a speed limit that's prescribed by the BLM for a sand highway. But the sand highway isn't one particular place, and that's the point the sergeant made. It's sand highways. But this is? I mean, Trier, in fact, could find this is a sand highway. There's a speed limit. Traffic rules are enforced. It's regularly used for travel in and out of the area. See, and that's why I think you go too far in your questioning about traffic laws enforced, because the sergeant explained that that's not the case. There's not specific laws that apply. Right. You just told me there wasn't a speed limit, and then I just looked it up, and there is. So, well, the speed limit, as the sergeant explained, is around areas of congestion. That's not what this says. It just says a 15-mile-an-hour speed rule exists on the sand highways. It's right there in your own excerpt. In which? Which is the excerpt, Your Honor? Page 66 of the SCR. It's the Bureau of Land Management's Imperial Sand Dunes Rules and Regulations. Right. And as the sergeant explained, there's one particular designated sand highway which runs along the freeway there. That is the only designated sand highway. The sand highway that they're talking about here is not an actual highway. If you look at the undisputed testimony of the sergeant, there's different areas out there that are correctly or regularly called sand highways that are not. And I can give you the site for what that is. If you look at Sergeant Massad's testimony, it's at the supplemental excerpts of records starting at 42 and going through 56. This is his entire testimony. But I think it's 45 through 46 that identify those particular areas where he says there are no specific rules out there that can be enforced traffic-wise. And I see that I'm over my time. All right. Thank you very much, counsel. Thank you. Two points. I understand both the zeal and the purpose of his arguing that the affidavits, excuse me, the declarations were not on personal knowledge. That is an issue that the trial court should have decided and resolved and left a record of that. At best, that means that it ought to be remanded to the court to take a look and examine the evidence and see whether it's really admissible. It's not something that the court considered them. We don't know. They were submitted. They were objected to. And the order from the court is silent on it. That's why the court referred to any of the declarations. No. I thought the court did. There's no reference in the order as to whether they considered it or not. That, of course, is the moving point of this entire appeal. The other issue is, and you alluded to it, the fact that everybody out there and the officers and all the witnesses call it the stand highway, is a recognition by ordinary people of what its purpose is. It was made for vehicular travel. That is sufficient to establish it under the criteria in Giddings. With that, unless you have more questions, Your Honor, I would end up circling back and repeating myself. Well, it's a good observation then. Thank you very much, counsel, both for your argument and briefing in this case. This matter is submitted. Again, I want to thank everyone here in the District of Arizona and Phoenix for a very, very good week. Look forward to doing it again. This panel is adjourned. The court for this session stands adjourned. Thank you.
judges: BYBEE, OWENS, COLLINS